FILED

2017 Mar-13  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DJR ASSOCIATES, LLC,            )
                                )
            Plaintiffs,         )
                                )
vs.                             )            Case No. 2:16-cv-1729-TMP
                                )
TERRY HAMMONDS,                 )
SPI CHEMICALS, LLC.,            )
                                )
            Defendants.         )

MEMORANDUM OPINION

This cause came before the court on January 5, 2017, for a hearing on the plaintiff's motion for a preliminary injunction. Plaintiff filed its original Complaint and Request for Preliminary and Permanent Injunction in the Circuit Court of Jefferson County, Alabama, on October 13, 2016. The defendants removed the action to this court on October 21, 2016. The court conducted a telephonic conference with the parties on October 24, 2016, as a result of which the parties consented to the dispositive jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) on October 25, 2016. (Doc. 9). At the request of the parties, the motion for a preliminary injunction was set for an evidentiary hearing on January 5, 2017.

Having now heard and examined the evidence presented by the parties at the time of the hearing, and having received and considered the briefs submitted by counsel, the court makes the following Findings of Fact and Conclusions of Law with respect to the motion.

Findings of Fact

1. The plaintiff, DJR Associates LLC, is an Alabama limited liability company with its principal place of business in Jefferson County, Alabama. Plaintiff operates under a franchise

using the tradename "ChemStation," selling industrial cleaning supplies and chemicals to food processing facilities, such as poultry processors and commercial kitchens, as well as cleaning supplies and chemicals for truck stops. The court will refer to the plaintiff by its tradename, "ChemStation."

2. ChemStation is owned by Russell Favorite, Brett Sutton, Joe Wilbanks, and Ann Matlock. It started in Bessemer, Alabama, in 1996, with four employees. It now employs approximately forty employees in facilities in Bessemer and Mobile, Alabama; Kennesaw, Georgia; and Hammond, Louisiana. It ranks as the Number 1 franchise for sales out of about sixty ChemStation franchisees nationwide.

3. Defendant Terry Hammonds was first employed by ChemStation in June 2010, at its Jefferson County location, in customer service. Before being employed at ChemStation, Hammonds worked as an industrial chemical salesman for Zee Company for about three years, and through that employment came to know several managers and industrial chemical buyers, such as Willie Lee (originally at Sanderson Farms and, later, at Gourmet Culinary Solutions) and Andy Harris.

4. Upon being hired at ChemStation, Hammonds executed a non-compete agreement dated June 14, 2010. Paragraph 2.1 of the agreement stated:

> 2.1 In consideration for employment with the Company and the salary agreed to between the Company and the Employee, Employee hereby agrees that during his employment by the Company and for a period of twelve (12) months following the termination of such employment for any reason whatsoever, he will not (except on behalf of or with the prior written consent of the Company), on his own behalf or in the service or on behalf of others, (I) solicit or divert or appropriate to a Competing Business, or (II) attempt to solicit, divert or appropriate to or for any Competing Business, any person or entity whose account with the Company was assigned, solicited, sold or serviced by or under the direct sales supervision of Employee, or from whom Employee has been the principal contact, or has supervised the principal contact during his employment by the

2

Company[.]  However, nothing in this Agreement shall prohibit Employee from soliciting a customer who severed its relationship with Employer at least one year prior to the termination of Employee.  A list of Employee's accounts subject to this restriction is attached as Exhibit ____.  This list may be updated by amendment or alternatively, Company unilaterally may conform the list to changes in the accounts of Employee.  Employee agrees that this time restriction is reasonable in light of industry considerations and the nature of the business of the Company.

Defendants' Ex. 7, Doc. 22-7.  There was no customer list attached as an exhibit to the agreement.

5.  In the Spring of 2012, Rusty Favorite approached Hammonds about the possibility of moving to Atlanta to take over ChemStation's sales territory north of Macon, Georgia.  This was viewed as a promotion and, when Hammonds agreed to the move, he received a pay raise.  As his job required him to make calls at various food processing plants, he was reimbursed for mileage expenses also.

6.  As a result of the move to Atlanta, ChemStation paid for Hammonds to attend several seminars and training sessions on food safety in Chicago and to attend trade shows in Atlanta, at which Hammonds was able to meet representatives of various existing and potential customers.

7.  Between June and October 2012, Hammonds was arrested for Driving Under the Influence.  ChemStation chose not to terminate his employment, and, indeed, provided him with transportation during the time his driver's license was suspended.

8.  Hammonds was good at his job and worked hard at it.  He received exemplary evaluations.  By October 2012, principals in ChemStation were discussing whether to require Hammonds to execute a new non-compete agreement.  This was prompted by concerns B.J. Wilbanks (Joe Wilbanks's son) had about losing his Georgia clients to Hammonds and by

Hammonds' recent DUI arrest.  On October 2, 2012, Joe Wilbanks emailed other managers, saying:

> I think this [a draft of a new non-compete agreement] looks good but it may be even more valuable to list specific customers such as Pilgrim's, Fieldale Farms, Wayne Farms, Proview Foods, Coleman/Kings Delight Foods, D&D Foods, Maplehurst Bakeries, Suzannah's Kitchen, Tip Top Foods, Tyson, DCS, PECO, Keystone Foods, etc. ( Brett and Rusty can add to this list...? )
> He gained significant contacts with these groups after joining our company and working with Brett and Rod. I agree that Birch should help us to make sure we are in the best position possible as the result of our decision yesterday to give him a chance to remain with our group.  I believe most companies would have released him as a result of his recent mistakes/problems and enforced the previously executed non-compete agreement.  If there is any hesitation or delay on his part to accept this supplemental non-compete he should be dismissed immediately. I feel we are going a long way to help him during this difficult time.

Plaintiff's Ex. 90, Doc. 23-26.  Joe Wilbanks' son, B.J. Wilbanks, also was a sales representative for ChemStation in the Atlanta office.  On October 3, 2012, the revised non-compete agreement was delivered to Hammonds, along with a written warning placing him on 60 days' employment probation.  Plaintiff's Ex. 59, Doc. 23-12, p. 7.

9.   Although the parties are unable to locate an original signed version, Hammonds apparently signed a new non-compete agreement on October 8, 2012, in the Atlanta office. Hammonds does not deny that his signature appears on a copy of the agreement, but he has no memory of signing it and he expresses skepticism that he would have signed it in the presence of B.J. Wilbanks.  There is no witness to the plaintiff's signature shown on the document.

10.   The 2012 agreement had three key provisions: one requiring the employee to maintain the confidentiality of ChemStation's proprietary business information, the second prohibiting a former employee from recruiting or hiring away ChemStation employees, and a third limiting competition by a former employee.  Paragraph 2 of the agreement states:

2.      **EMPLOYEE'S CONFIDENTIALITY COVENANT**.  The Employee hereby acknowledges that, as a necessary result of the Employee's position with the Employer and the nature of the duties assigned to the Employee as an employee of the Employer, Confidential Information shall be disclosed or otherwise made available to the Employee solely for the purpose of enabling the Employee to perform such duties.  From and after the date of this Agreement, the Employee shall hold all Confidential Information in confidence and shall not:

(a)      communicate or disclose Confidential Information to any party other than (1) the Employer and the Affiliates, (2) the employees of the Employer and the Affiliates who are authorized to receive such Confidential Information or (3) a party to whom such communication or disclosure has been authorized by the Employer or an Affiliate;

(b)      duplicate, copy or make any record of any Confidential Information without the prior written authorization of the Employer or an Affiliate; and

(c)      use any Confidential Information for the benefit of the Employee or any party other than the Employer and the Affiliates or for any purpose other than the performance of the Employee's duties as an employee of the Employer.

Immediately upon the termination of the Employee's employment with the Employer for any reason, the Employee shall return to the Employer all Confidential Information then in the Employee's possession.

Plaintiff's Ex. 1, Doc. 23-1.

11.  Paragraph 3 of the 2012 agreement states:

3.      **EMPLOYEE'S NONSOLICITATION COVENANT**.      In further consideration of Employee's employment with Employer and the Confidential Information disclosed or otherwise made available to the Employee, Employee further agrees not to solicit Employer's business relationships as follows:

(a)  **Nonsolicitation**.  The Employee agrees that, during the term of Employee's employment with the Employer and for a period of two (2) years thereafter, Employee will not, directly or indirectly, either individually or as a stockholder, director, officer, consultant, independent contractor, employee, agent, member, or otherwise of or through any corporation, partnership, company, association, joint venture, firm or other entity, or in any other capacity:

(1)     employ or offer to employ in any capacity, solicit or attempt to divert or entice away any person who is an employee, agent, representative or independent contractor with the Employer, or any former employee, agent, representative or independent contractor of Employer whose relationship with Employer was terminated within six months of the date of Employee's termination of employment with Employer; or

(2)     sell or offer to sell any product or service similar in kind to those offered by Employer to any client or customer of the Employer within the states of Alabama, Mississippi, or Georgia from Macon northward.

(b)     **Reasonable Protection**.  The Employee agrees that Employee has carefully read and understands the provisions of this Agreement and, having done so, agrees that the restrictions in this paragraph are fair and reasonable and are necessarily required for the protection of the interests of the Employer, and due to the nature of the business of the Employer, a more limited geographical restriction would not be reasonable or appropriate.

(c)     **Continued Enforceability**.  In the event that any court of competent jurisdiction should declare any provision contained in this Agreement to be unenforceable, void or voidable as unreasonable with respect to the time or geographical area or otherwise, the provisions of the Agreement shall remain in effect for whatever time period and shall cover whatever geographical area that such court does not declare to be unreasonable, void or voidable.

(d)     **Duty of Loyalty**.  Nothing in this Agreement shall be construed to limit the Employee's legal duties to the Employer while employed by the Employer which include, but are not limited to, the Employee's obligation to act solely in the Employer's best interest and the Employee's duty of loyalty to the Employer. While the Employee is employed by the Employer, the Employee shall not undertake or engage in any planning or other activity directed towards, or designed to result in, any competition with the Employer.


Plaintiff's Ex. 1, Doc. 23-1.

12.  Paragraph 6(d) of the 2012 agreement states:


(d)     **Governing Law and Jurisdiction**.  This Agreement shall at all times be governed by and construed, interpreted and enforced in accordance with the law of the State of Alabama without regard to the conflict of laws provision thereof. **THE PARTIES HERETO AGREE TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS OF JEFFERSON COUNTY, ALABAMA FOR RESOLVING ANY DISPUTE ARISING IN CONNECTION WITH THIS AGREEMENT.**

Plaintiff's Ex. 1, Doc. 23-1.

13.   From mid-2012 to late 2015, Hammonds worked out of the Atlanta office of ChemStation, under the supervision of Joe Wilbanks in Atlanta.  Most of his client contacts were in Georgia.  Hammonds traveled to Birmingham at least annually for an employee evaluation, and he participated by telephone from his Atlanta office in a weekly sales meeting organized and hosted by the Birmingham Office.  His pay checks and expense reimbursement checks were paid out of ChemStation's Alabama Regions Banks account.

14.   During Hammonds' employment with ChemStation, he had access to the TANKS computer system, on which confidential business information was stored.  Hammonds had access to chemical formulations, blending methods, payroll data, customer lists, and pricing and cost data.

15.   In the Spring of 2015, Hammonds approached ChemStation about the possibility of his buying ChemStation's Atlanta operations and setting it up as a separate business.  Because the suggested purchase price "was not in the ball park," the negotiations went nowhere.

16.   During the summer of 2015, Hammonds began considering starting his own business, but he took no steps toward doing so until just before Thanksgiving.  On November 15, 2015, he contacted Kerry Sharp (ChemStation's Personnel Director) to get a copy of his non-compete agreement, and she gave him a copy of the 2010 (not the 2012) agreement.  He also began to develop a business plan, part of which was a listing of potential customers, both those immediately available and those available after one year.

17.   Around this same time, Hammonds began emailing proprietary business information from his ChemStation email account to his person Gmail account.  On November 19, 2015, he

emailed to himself product information about "ChemSan 1220 and 1220-10."  (Plaintiff's Ex. 96, Doc. 23-31).  The next day he emailed to himself a "Quat. Neutralization calculator."  (Plaintiff's Ex. 97, Doc. 23-32).   On December 15, 2015, he emailed to himself ChemStation's "Lot Numbering SOP."  (Plaintiff's Ex. 98, Doc. 23-33).   On December 23, 2015, he emailed to himself a purchase order from Tip Top Poultry to ChemStation, with product pricing and contact information on it.  (Plaintiff's Ex. 99, Doc. 23-34).  On January 10, 2016, he emailed to himself a business lead supplied by Troy Bolden.  (Plaintiff's Ex. 100, Doc. 23-35).

18.  On November 25, 2015, Hammonds emailed the list of potential customers to Jerrill Sprinkle, a potential investor in Hammonds' proposed business venture.  In the email, he stated, "I also think that I have a way around my non-compete…"  (Plaintiff's Ex. 95, Doc. 23-30).  Five days later, Sprinkle replied to the email, saying in part, "Plan looks good and I can add couple customers to the list.  Do you think you can make a living for 12 months—I'm planning on seeding some money up front of course."  (Id.)   That same day, November 30, 2015, Hammonds responded to Sprinkle's email, explaining how he thought he could make a living for a year, adding, "Just let me know about meeting with Tom and if you thought anymore about the convo we had about the non-compete.  I really think that might fly."  (Id.)

19.  Among the customers Hammonds listed as available after a one-year wait following his anticipated resignation from ChemStation were various Fieldale entities (including the Fieldale Truck Wash) and Harrison Poultry.  Hammonds also noted as an immediate customer "Harrison Poultry—some products."   Gourmet Culinary Solutions ("GCS") is not listed at all under any category.  (Plaintiff's Ex. 73, Doc. 23-19).   Also, of the forty-two potential customers listed as being immediately available for sales and those available only after a year wait, all but

three (Fitco, Peco Foods, and Conecuh Sausage) are in Georgia.  Also, of those forty-two potential customers, Hammonds had served only five for ChemStation.

20.   Hammonds resigned his employment with ChemStation on January 11, 2016, in a letter addressed to Rusty Favorite.   It appears that he hand-delivered the letter to the ChemStation headquarters in Birmingham as he also had an exit interview that same day with Brett Sutton and Personnel Director Kerry Sparks.  Although Hammonds turned in his company laptop computer and cellphone at the exit interview, he already had forwarded his contacts from the company cellphone to his personal cellphone.  During the exit interview, Kerry Sharp again gave Hammonds a copy of the 2010 (not the 2012) non-compete agreement.

21.   After the interview, Hammonds had lunch with Brett Sutton, at which Sutton asked Hammonds whether his future business opportunities would involve competing with ChemStation.  Hammonds replied that he was "not sure the direction [his] business will go." Hammonds was not sure whether his business would focus on small cleaning supplies or on bulk sales, more directly in competition with ChemStation.

23.   A day or two after his resignation, Hammonds had a telephone conversation with Rusty Favorite, in which he said he did not intend to compete with ChemStation because "you've been too good to me."  Favorite told Hammonds that he wished him success in his new business venture.

22.   One day after resigning from ChemStation, defendant Hammonds incorporated his new business, defendant SPI Chemicals LLC, on January 12, 2016, in Georgia.

23.   ChemStation became suspicious that Hammonds was preparing to compete for business almost immediately.  On January 13, 2016, an email addressed to Hammonds at his old ChemStation address from Chris Glover of Chemgroup suggested to ChemStation that

Hammonds was attempting to develop products similar to those sold by ChemStation.  In the email, Glover reported to Hammonds a list of "Chemstation products that we [Chemgroup] do know the color match for."  See Plaintiff's Ex. 38, Doc. 23-8.

24.  Apparently still concerned about the potential problems with Hammonds resigning, ChemStation had its attorney mail a letter to Hammonds on January 26, 2016, reminding him of the provisions of the non-compete agreement.  Without referring explicitly to the 2012 agreement, the letter stated:

> While employed with Chemstation, you signed a Confidentiality and Non-Solicitation Agreement (the "Agreement") that recognized the confidential information entrusted to you in connection with the employment relationship. In that Agreement; you agreed to the following:
>
> 1.    To keep confidential all information pertaining to Chemstation and not to use any of such information for the benefit of any other party;
>
> 2.    For a period of two years not to solicit Chemstation's business relationships by seeking to employ or solicit employees representatives or other agents of Chemstation; and
>
> 3.    For a period of two years not to sell or offer any product of service similar in kind to those offered by Chemstation to any client or customer of Chemstation within the States of Alabama, Mississippi or Georgia from Macon northward.

Plaintiff's Ex. 2, Doc. 23-2.

25.  A few days later, on February 2, 2016, attorney Thomas E. Raines responded to the letter of January 26 with a letter on behalf of Hammonds.  The letter acknowledged that Raines had received a copy of the 2012 non-compete agreement, but asserted further:

> In November of 2015, Mr. Hammonds made a request of the ChemStation Office Manager, Kerry Sharp, to provide him a copy of any written agreements he had with ChemStation and received an email from her dated November 16, 2015, in which she forwarded a copy of that certain Confidentiality And Non-Solicitation

Agreement bearing the date of June 14, 2010, a copy of which is enclosed (the "2010 Agreement").  Again on his last day of work (January 11, 2016) at his exit interview with Ms. Sharp and Brett Sutton, his personnel file was reviewed and he was provided with a copy of the 2010 Agreement.  According to those ChemStation representatives, one of which I understand is an owner of ChemStation, the 2010 Agreement was the applicable agreement.

Plaintiff's Ex. 3, Doc. 23-3.  On February 9, 2016, Kerry Sharp emailed to Hammonds a copy of the 2012 non-compete agreement.  (Defendants' Ex. 9, Doc. 22-9).

26.  Soon after the first of the year in 2016, Hammonds and his new business, defendant SPI Chemicals, LLC, ("SPI"), began having contact with current and/or former ChemStation customers.  Hammonds and SPI have conducted business with at least Harrison Poultry, Fieldale Box Wash, and Gourmet Culinary Solutions, all of whom are Georgia entities, located in Georgia.

27.  Michael Sullens, the plant manager at Fieldale Farms' Box Wash in Gainesville, Georgia, testified by affidavit (Defendants' Ex. 1, Doc. 22-1) that he initiated contact with Hammonds and SPI after learning that Hammonds had left ChemStation.  He has purchased four sample barrels of sanitization chemicals from Hammonds and SPI.

28.  W.L. "Willie" Lee testified by affidavit (Defendants' Ex. 4, Doc. 22-4) that he is the General Manager of Signature Foods, which owns and operates Gourmet Culinary Solutions ("GCS") in Statham, Georgia.  He is responsible for making decisions regarding sanitation chemicals and services.  After experiencing problems with ChemStation's services after Hammonds left its employment, Lee obtained Hammonds' new phone number and contacted him with a request to provide a description of SPI's products and prices.  ChemStation has sold approximately $167,980.00 in products to GCS between April 2011 and July 2016.  (Plaintiff's Ex. 19, Doc. 23-5).

29.    Andy Harris testified by affidavit (Defendants' Ex. 2, Doc. 22-2) that he knew Hammonds when the defendant worked for Zee Company, and continued to do business with him when Hammonds went to ChemStation.  When Harris started working with Harrison Poultry in Bethlehem, Georgia, in 2013, he continued to use Hammonds as the source for his sanitation chemicals.  After Hammonds left ChemStation, Harris initiated contact with Hammonds and SPI after Harrison Poultry experienced a problem with "caustic freezing," requesting a quote from Hammonds.    Harris  also  testified  that  he  had  problems  with  purchasing  bromine  from ChemStation, and ultimately decided to get the chemical from another vendor, Safe Foods. ChemStation did over $1 million in business with Harrison Poultry between August 2013 and April 2016.  (Plaintiff's Ex. 30, Doc. 23-6).

<u>Conclusions of Law</u>

A preliminary injunction is a drastic and extraordinary remedy.  <u>American Civil Liberties Union of Florida, Inc. v. Miami-Dade County School Bd.</u>, 557 F.3d 1177, 1198 (11th Cir. 2009); <u>United States v. Jefferson County</u>, 720 F.2d 1511, 1519 (11th Cir. 1983); <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998).  Commenting on injunctive relief generally in <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 165–66, 130 S. Ct. 2743, 2761, 177 L. Ed. 2d 461 (2010), the Supreme Court explained:

> An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.  *See, e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).  If a less drastic remedy… was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted. *See ibid.; see also Winter* [*v. Natural Resources Defense Council, Inc*., 555 U.S. 7, ___, 129 S. Ct. 365, 380–382, 172 L. Ed. 2d 249 (2008)].

Id.  Whether to grant preliminary injunctive relief is considered pursuant to a four-factor test, on each of which the movant must clearly establish the burden of persuasion.  The movant must demonstrate "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is issued, and (4) an injunction would not disserve the public interest."  Odebrecht Const., Inc. v. Secretary, Florida Dep't of Transp., 715 F.3d 1268, 1273–74 (11th Cir. 2013); see also Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011) (quoting North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008)).  However, "none of the four prerequisites has a fixed quantitative value.  Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."  Unisource Worldwide, Inc. v. S. Cent. Alabama Supply, LLC, 199 F. Supp. 2d 1194, 1199 (M.D. Ala. 2001), quoting State of Texas v. Seatrain Int'l, 518 F.2d 175, 180 (5th Cir.1975).

    A.  *Likelihood of Success on the Merits*

    For ChemStation to be entitled to preliminary injunctive relief against Hammonds and SPI, it must clearly establish a likelihood of success on the merits of its claim that the defendants have breached the contractual non-compete agreement between ChemStation and Hammonds. The court has no doubt that the appropriate agreement upon which to consider this issue is the 2012 non-compete agreement.  Not only does it bear Hammonds's signature, Hammonds has not really disputed that he signed it.  While he testified that he has no recollection of signing it and that he is skeptical he would have signed it with B.J. Wilbanks present, he has not denied that it is his signature on the agreement.  Also, the 2012 agreement has a merger clause it in, indicating

that it is the only agreement between the parties and that all other earlier agreements have been replaced by it.

A threshold question that must be addressed on the likelihood of success is whether the law of Alabama or the law of Georgia is to be used in the analysis of the merits of the contractual claim.  The first principle to apply is the rule that, "A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits."  Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308 (11th Cir. 2004), quoting O'Neal v. Kennamer, 958 F.2d 1044, 1046 (11th Cir. 1992).  Thus, the beginning point of the analysis is application of Alabama choice-of-law rules.  In contract cases, Alabama follows the rule of *lex loci contractus*: the law of the place where the contract was made applies, unless the parties have legally contracted "with reference to the laws of another jurisdiction."  Id., citing and quoting Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991); see also Macey v. Crum, 249 Ala. 249, 30 So. 2d 666 (1947); J.R. Watkins Co. v. Hill, 214 Ala. 507, 108 So. 244 (1926).  "Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement."   Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991), citing Craig v. Bemis Co., 517 F.2d 677 (5th Cir. 1975).  In contract disputes, courts "first look to the contract to determine whether the parties have specified a particular sovereign's law to govern."  Stovall v. Universal Const. Co., Inc., 893 So. 2d 1090, 1102 (Ala. 2004); see also Clanton v. Inter.Net Global, L.L.C., 435 F.3d 1319, 1323 (11th Cir. 2006); Wachovia Bank, Nat'l Ass'n v. L & H Investments, LLC, 728 F. Supp. 2d 1307, 1311 (M.D. Ala. 2010).  If the parties have not selected a particular state's law, the law of the state where contract was made applies.

When the parties to a contract have chosen the law of a particular state to apply, that selected state's law ordinarily will govern the contract dispute in a court in Alabama, notwithstanding the fact that the contract may have been formed in a different state. Thus, for example, the parties to a contract formed in Georgia may select the law of Florida to apply to the contract, and a court in Alabama will enforce that selection. However, where the selected state's law is contrary to Alabama's public policy, Alabama substantive contract law will govern. A district court in Alabama has explained:

> Nevertheless, "[w]hile parties normally are allowed to choose another state's laws to govern an agreement, where application of that other state's laws would be contrary to Alabama policy, the parties' choice of law will not be given effect and Alabama law will govern the agreement." [*Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507 (Ala. 1991)]. To resolve such conflicts of laws questions, Alabama appellate courts have applied the choice of law approach set forth by the United States District Court for the Southern District of Alabama in *Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123 (S.D. Ala. 1978). *Brown* at 506.

> The *Blalock* court cited and adopted the approach set forth by the RESTATEMENT (SECOND) OF CONFLICTS OF LAW. *Blalock*, 458 F. Supp. at 127. Section 187 of the RESTATEMENT provides as follows:

>> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

>> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

>>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the

particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

In *Blalock*, the court concluded that "section 187(2)(b) clearly requires this Court to refuse enforcement of the anti-competition covenant since it flies directly in the face of the public policy of Alabama as set out by statute, and since the Court concludes that Alabama law would be applicable but for the contractual choice of Pennsylvania." *Blalock*, 458 F.Supp. at 127. The Restatement specifies that:

> When application of chosen law would be contrary to fundamental policy of state of otherwise applicable law. Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation. The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties. The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law. Application of the chosen law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 cmt. g (1971).

The Alabama Supreme Court found that "Alabama's policy against covenants not to compete is a fundamental public policy ...." *Cherry, Bekaert & Holland*, 582 So.2d at 507. Thus, where Alabama law would be applicable, but for the parties' selection of another state's law, and where Alabama has a greater material interest, notably a covenant that is to be enforced in Alabama and against an Alabama resident, Alabama courts will not apply another state's law, if the covenant not to compete is void under Alabama law. *Id.* at 507; see also *Unisource Worldwide, Inc. v. South Central Alabama Supply, LLC*, 199 F.Supp.2d 1194, 1201–02 (M.D.Ala. 2001).

Benchmark Medical Holdings, Inc. v. Rehab Solutions, LLC, 307 F. Supp. 2d 1249, 1259–60 (M.D.Ala. 2004).

This rule recognizes the sovereignty of each State. State courts should not be required to enforce a contract provision that is fundamentally at odds with the public policy of the State just because the parties have selected the law of another State with a lesser interest in the contract dispute. The desire of the parties is outweighed by the sovereignty of the State. Thus, as the court in Unisource Worldwide explained, "The issues that must be addressed by the court are: 1) whether application of [the chosen state's] law 'would be contrary to a fundamental policy of a state which'; 2) 'has a materially greater interest than the chosen state in the determination of the particular issue'[1]; and 3) 'under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'" Unisource Worldwide, Inc. v. South Central Alabama Supply, LLC, 199 F. Supp. 2d 1194, 1200 (M.D. Ala. 2001); see also Wingard v. Lansforsakringar AB, 2013 WL 5493177, at *12 (M.D. Ala. Sept. 30, 2013) ("Alabama courts analyze whether a party's contractual choice-of-law clause is enforceable by reference to the Second Restatement of Conflicts §§ 187–88.").

In the instant case, the contract executed by the parties in October 2012 clearly chooses the law of Alabama to be applied to any dispute under it. Paragraph 6(d) states in part, "This Agreement shall at all times be governed by and construed, interpreted and enforced in accordance with the law of the State of Alabama without regard to the conflict of laws provision thereof." The contract was formed, however, in Georgia. Hammonds resided and worked there,

---

[1]   It must be noted here that the application of Restatement (Second) § 187 is issue specific; it may or may not apply to every issue involved in a contract dispute. The relative interests of States may vary depending upon the nature of the "particular issue" being addressed. Within a single contract, one provision may relate to the fundamental public policy of a State, requiring the use of § 187 in choosing the law applicable that "particular issue," while others do not.

ChemStation maintained an office there, and Hammonds signed it there, as did a representative of ChemStation.  There is no indication that any signatures were affixed to the contract other than in Georgia.  The contract apparently was drafted in Alabama by ChemStation's Alabama counsel, but it was not negotiated in any sense of the word—it was presented to Hammonds as a take-it-or-leave-it choice.  ChemStation emailed the contract to Hammonds at his address in Georgia, knowing that he would receive it in Georgia.  Thus, the choice-of-law question presented is whether this court, sitting in Alabama with diversity jurisdiction, applies Alabama law as the selected state law, or Georgia law as *lex loci contractus*[2] or under § 187(2)(b).

As discussed above, a court sitting in Alabama must first look to Alabama choice-of-law rules.[3]  In sum, "Alabama courts analyze whether a party's contractual choice-of-law clause is enforceable by reference to the Second Restatement of Conflicts §§ 187–88."  Wingard v. Lansforsakringar AB, 2013 WL 5493177, at *12 (M.D. Ala. Sept. 30, 2013).  Thus, the court must decide "1) whether application of [Alabama's] law 'would be contrary to a fundamental policy of a state which'; 2) 'has a materially greater interest than [Alabama] in the determination of the particular issue'; and 3) 'under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'"  Unisource Worldwide, Inc. v. South

---

[2]   If the rule to be applied under Alabama conflicts of law concepts is a simple, unadorned *lex loci contractus* (as distinct from the more complex Restatement analysis), Georgia substantive law applies to the entire 2012 agreement, as that is where the contract was formed.

[3]   The contract language at issue in this case calls for the court to apply Alabama law "without regard to the conflict of laws provision thereof."  To the extent this language was intended to override Alabama conflict-of-laws rules, the court finds it unenforceable.  Because conflict-of-laws rules address the fundamental public policy of the States interested in the dispute, the parties may not override state law on that question.  Doing so essentially nullifies the state law invoked to decide which state law must apply, and it does so without regard to the important considerations of the fundamental policy of each State.  As the Comments following RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 187 state, "Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation."

Central Alabama Supply, LLC, 199 F. Supp. 2d 1194, 1200 (M.D. Ala. 2001).  Thus, because the parties attempted to choose the law to be applied, Alabama law requires analysis under §§ 187 and 188 of the Restatement.

First, the court recognizes that Restatement § 187(1) does not apply because the "particular issue[s]"—the enforceability of the respective non-compete and confidentiality covenants of the 2012 contract—are not "one[s] which the parties could have resolved by an explicit provision in their agreement directed to [those] issue[s]."  RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 187(1); see Cardoni v. Prosperity Bank, 805 F.3d 573, 581 n. 7 (5th Cir. 2015); Pro Edge, L.P. v. Gue, 374 F. Supp. 2d 711, 737 (N.D. Iowa, 2005), citing Baxter International, Inc., v. Morris, 976 F.2d 1189, 1196 (8th Cir. 1992).  Questions regarding the validity of a contract provision necessarily must be resolved by a court by reference to properly-selected law.  Thus, the analysis moves to § 187(2).

Turning to § 187(2), the law of the chosen State (Alabama) should apply unless either of two circumstances exists: (a) Alabama has no substantial connection to the parties or the transaction in question, or (b) the substantive law of Alabama is contrary to the fundamental policy of another State with a materially greater interest in the "particular issue" in dispute.  In this case, Alabama clearly has a substantial connection to the parties and issues involved.  ChemStation is an Alabama company, headquartered in Jefferson County, Alabama.  The choice of Alabama law was not unreasonable.  Hence Restatement § 187(2)(a) does not preclude the choice of Alabama law.

Under § 187(2)(b) there are three pertinent inquiries in deciding what state's law to apply to the "particular issues" raised in the contract: (1) is there another state with a "materially greater interest" in the "determination of the particular issue"; (2) is Alabama's law, as the

chosen state, contrary to the "fundamental policy" of such other state; and (3) would the law of the other state be the applicable law under the rule of § 188 of the Restatement?  The two states that have an interest in the "particular issue[s]" raised in this case are Alabama and Georgia, and the question is whether either has a "materially greater interest" in the determination of the particular issues raised.  It seems clear that Georgia law would be the applicable law in the absence of an effective contractual choice by the parties.  Under both Alabama's *lex loci contractus* rule and through application of Restatement § 188, Georgia law seems preferable.  Georgia is where the contract was formed.  Based on the evidence before the court,[4] it is where all required signatures were affixed to it, and it became immediately effective.  Under Restatement § 188, a court must examine a non-exhaustive list of factors in measuring which state has "the most significant relationship to the transaction and the parties."  These factors include, "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2).  Applying these factors, Georgia edges Alabama as the state with the most significant relationship to the transaction and the parties.  Georgia is the state where the contract was formed.  There appears to have been no real negotiation of the contract, as it was presented to Hammonds, in Georgia, as a take-it-or-leave-it proposition.  Although ChemStation is incorporated and based in Alabama, it also operates in Georgia and maintains an office there.  The relationship between ChemStation and Hammonds

---

[4]   The parties have been unable to locate the original signed 2012 contract; all that is available is a photostatic copy showing Hammonds' signature and a signature by B.J. Wilbanks, ChemStation's representative.  It is undisputed that both of these signatures were affixed in Georgia.  It would be ChemStation's burden to show other than that the contract was executed in Georgia.

embodied in the contract focused mostly on customer development and service in Georgia, as almost all of Hammonds customer contacts were in Georgia.   ChemStation supervised Hammonds through a supervisor located in Georgia, although Hammonds also participated in telephone conference sales meetings led from Alabama.   Throughout the duration of the agreement, Hammonds was a citizen and resident of Georgia.   The court concludes, therefore, that under § 188, Georgia law would be the applicable law in the absence of an effective choice by the parties to the agreement.

The court also finds that Georgia has a materially greater interest the determination of the "particular issue" involving enforcement of the non-compete covenant.   In addition to the factors outlined above concerning Georgia's significant relationship with the transaction and parties, it has an even stronger interest in the "particular issue" of the non-compete covenant arising from the fact that the economic relationships the non-compete covenant has impacted for purposes of ChemStation's motion for a preliminary injunction are entirely in Georgia.   It is true that ChemStation and, through it, Alabama have an interest in ChemStation's customer relationships in Georgia, but Hammonds and the customers he seeks to service (Harrison Poultry, Fieldale Box Wash, and Gourmet Culinary Solutions) are all in Georgia.   The business Hammonds wants to operate, SPI Chemicals, is a Georgia corporation with its principal place of business in Georgia. Thus, as to the "particular issue" of the enforcement of the non-compete agreement, the greatest economic impact will be felt in Georgia.   Although ChemStation certainly feels an economic impact from competition for its Georgia customers, those customers are only a part of its larger pool of customers scattered over parts of five states.   For Alabama, the enforcement of the non-compete agreement impacts only some of ChemStation's business, but for Georgia, it is focused entirely in the state.   For this reason, the court finds that Georgia has a materially greater interest

in the "particular issue" of enforcement of the non-compete agreement.   Cf. Cardoni v. Prosperity Bank, 805 F.3d 573 (5th Cir. 2015) (finding that Oklahoma had a materially greater interest in the enforceability of a non-compete agreement with former employees who were in Oklahoma, the former employer operated branch banks in Oklahoma, and a competing bank seeking to employ the former employees was in Oklahoma, even though the former employer was a Texas bank headquartered in Texas).

At this point, the court must pause to note that the instant motion for a preliminary injunction raises two distinct issues, whether the non-compete covenant should result in a preliminary injunction against Hammonds and SPI, and whether Hammonds and SPI should be enjoined from using any of ChemStation's confidential proprietary and business information obtained during Hammonds' employment with ChemStation.[5]  The court concluded above that Georgia has a materially greater interest in the enforceability of the non-compete clause, but the calculation is different as to the confidentiality clause.   Alabama has a greater interest in protecting one of its businesses from be harmed in the competitive marketplace by the unauthorized use of its private and confidential business information—information obtained by Hammonds and SPI only because of Hammonds' previous employment with ChemStation.  The use of private, confidential information obtained from a competitor creates an unfair competitive advantage, and Alabama has a great interest in protecting Alabama businesses from being subjected to such unfair competitive disadvantages.  That interest reaches beyond Alabama's borders to any unfair use of confidential business information that can harm an Alabama business even though the use occurs in another state.  Georgia, on the other hand, has little interest in allowing or protecting unfair competition through the improper use of confidential

---

[5]   In its post-hearing brief, ChemStation raises a third issue of Hammonds and SPI attempting unsuccessfully to recruit a ChemStation employee in Mobile to come to work for the defendants.

business information.  Thus, the § 187(2)(b) analysis arrives at different conclusions when it is applied to the separate "particular issues" of the non-compete covenant on the one hand and the confidentiality covenant on the other.  Because Georgia has no "materially greater interest" in the "particular issue" of enforcement of the confidentiality provisions in the 2012 agreement, Alabama law applies that question.

The final question under § 187(2)(b) is whether Alabama's law, as the chosen substantive law relating to the enforceability of a non-compete covenant in the 2012 agreement, is contrary to the fundamental policy of Georgia, the state with the materially greater interest in that "particular issue."[6]  Alabama's law relating to non-compete agreements is now codified at Alabama Code §§ 8-1-190 et seq., effective January 1, 2016.  But this statutory law was intended by the legislature to be no more than a codification of Alabama's existing case law.  See Alabama Code § 8-1-197 (Suppl. 2015) Alabama Comment. ("This section is intended to codify current Alabama case law.").  Presumably, therefore, case law decided prior to January 1, 2016, is still good law for guidance on issues arising under the new statute.

New Alabama Code § 8-1-190 retains Alabama's general prohibition of contracts in restraint of trade in subsection (a), stating, "(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by

---

[6]   Cardoni v. Prosperity Bank, 805 F.3d 573 (5th Cir. 2015), makes clear that the use of the term "particular issue" in § 187 of the Restatement requires a court to examine each separate contract issue under the § 187 three-part test.  For example, in Cardoni, the Fifth Circuit analyzed separately whether Texas law (as the chosen law) or Oklahoma law applied to the separate sections of a contract providing, respectively, for non-competition by former employees, nonsolicitiation by former employees, and confidentiality of proprietary information possessed by former employees.  Each is a "particular issue" on which a state may or may not have a fundamental policy, and on which a different answer as to the applicable law might occur under the § 187 standard.  The same question can occur when examining which state has a "materially greater interest" in a "particular issue."  Thus, each "particular issue" must be examined separately under § 187(2)(b).

this section is to that extent void."  Subsection (b) then lists six exceptions to this general rule, including paragraphs (4) and (5), which provide:

> (b) Except as otherwise prohibited by law, the following contracts are allowed to preserve a protectable interest:
>
> * * *
>
> (4) An agent, servant, or employee of a commercial entity may agree with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place.  Restraints of two years or less are presumed to be reasonable.
>
> (5) An agent, servant, or employee of a commercial entity may agree with such entity to refrain from soliciting current customers, so long as the commercial entity carries on a like business, subject to reasonable time restraints. Restraints of 18 months or for as long as post-separation consideration is paid for such agreement, whichever is greater, are presumed to be reasonable.

Further, Alabama Code § 8-1-191 defines a "protectable interest" as follows:

> (a)  A protectable interest includes all of the following:
> (1)  Trade secrets, as defined in Section 8-27-2.
> (2)  Confidential information, including, but not limited to, pricing information and methodology; compensation; customer lists; customer data and information; mailing lists; prospective customer information; financial and investment information; management and marketing plans; business strategy, technique, and methodology; business models and data; processes and procedures; and company provided files, software, code, reports, documents, manuals, and forms used in the business that may not otherwise qualify as a trade secret but which are treated as confidential to the business entity, in whatever medium provided or preserved, such as in writing or stored electronically.
> (3)  Commercial relationships or contacts with specific prospective or existing customers, patients, vendors, or clients.
> (4)  Customer, patient, vendor, or client good will associated with any of the following:
>> a.   An ongoing business, franchise, commercial, or professional practice, or trade dress.
>> b.   A specific marketing or trade area.

(5) Specialized and unique training involving substantial business expenditure specifically directed to a particular agent, servant, or employee; provided that such training is specifically set forth in writing as the consideration for the restraint.

These provisions are declared expressly by <u>Alabama Code</u> § 8-1-197 to be "fundamental public policies of the State of Alabama."

By comparison, Georgia also has statutory authority dealing with restrictive covenants not to compete that became effective on May 11, 2011, prior to the date of the October 2012 agreement between the parties in this case.  See <u>Ga. Code Ann.</u> § 13-8-50 *et seq.*  As a matter of public policy, § 13-8-50 states that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." <u>Ga. Code Ann</u>. § 13-8-50.  Moreover, Georgia statutory law allows for restrictive covenants between an employer and employees who "[c]ustomarily and regularly solicit for the employer customers or prospective customers," or "[c]ustomarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others…."  However, that same statute limits the scope of the non-compete covenant to prohibiting *solicitation* of the employer's customers by the former employee.  It states:

(b) Notwithstanding any other provision of this chapter, an employee may agree in writing for the benefit of an employer to refrain, for a stated period of time following termination, *from soliciting, or attempting to solicit*, directly or by assisting others, any business from any of such employer's customers, including actively seeking prospective customers, with whom the employee had material contact during his or her employment for purposes of providing products or services that are competitive with those provided by the employer's business. No express reference to geographic area or the types of products or services

considered to be competitive shall be required in order for the restraint to be enforceable. *Any reference to a prohibition against "soliciting or attempting to solicit business from customers" or similar language shall be adequate for such purpose and narrowly construed to apply only to: (1) such of the employer's customers, including actively sought prospective customers, with whom the employee had material contact; and (2) products or services that are competitive with those provided by the employer's business.*

Ga. Code Ann. § 13-8-53(b) (italics added for emphasis).   Also, the same Georgia Code

provision recognizes the enforceability of confidentiality covenants:

> (e) Nothing in this article shall be construed to limit the period of time for which a party may agree to maintain information as confidential or as a trade secret, or to limit the geographic area within which such information must be kept confidential or as a trade secret, for so long as the information or material remains confidential or a trade secret, as applicable.

Ga. Code Ann. § 13-8-53(e).  Finally, Ga. Code Ann. § 13-8-53(d) mandates that

> (d) Any restrictive covenant not in compliance with the provisions of this article is unlawful and is void and unenforceable; provided, however, that a court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties.

With respect to judicial remedies for enforcement of restrictive covenants, another provision

reiterates that courts may modify the terms of a restrictive covenant to make it consistent with

Ga. Code Ann. § 13-8-53.  Specifically:

> (b) In any action concerning enforcement of a restrictive covenant, a court shall not enforce a restrictive covenant unless it is in compliance with the provisions of Code Section 13-8-53; provided, however, that if a court finds that a contractually specified restraint does not comply with the provisions of Code Section 13-8-53, then the court may modify the restraint provision and grant only the relief reasonably necessary to protect such interest or interests and to achieve the original intent of the contracting parties to the extent possible.

Ga. Code Ann. § 13-8-54(b).  Ga. Code Ann. § 13-8-57(b) establishes a rebuttable presumption

that two years is a reasonable period for a restrictive covenant prohibiting solicitation by a

former employee.  Even so, courts may consider the economic hardship a restrictive covenant

has on a former employee when assessing the reasonableness of the covenant.  See Ga. Code

Ann. § 13-5-58(d).

Consistent with this statutory scheme, Georgia holds (and has held for some time) that

> [A] restrictive covenant "may not validly preclude the employee from accepting
> unsolicited business from customers of his former employer." *Vulcan Steel*
> *Structures, Inc. v. McCarty*, 329 Ga. App. 220, 221–222(1), 764 S.E.2d 458
> (2014).  An employer may properly protect itself from the risk that a former
> employee "might appropriate its customers by taking unfair advantage of client
> contacts developed while working for that employer, but the company cannot
> prevent [the employee] from merely accepting overtures from those customers."
> (Citation and punctuation omitted.)  *Id.* at 222(1), 764 S.E.2d 458.

Holland Insurance Group, LLC v. Senior Life Insurance Co., 329 Ga. App. 834, 840, 766 S.E.2d

187, 193 (2014).[7]  While a restrictive covenant that prohibits a former employee "from

soliciting, or attempting to solicit, directly or by assisting others, any business from any of such

employer's customers" can be a valid restriction for up to two years, covenants that purport to

prevent a former employee from engaging in or accepting *unsolicited* business from the former

employer's customers are invalid and void.  "A restrictive covenant without territorial limitations

that limits a former employee from accepting business from any customer of the former

---

[7]  The court recognizes that Holland was decided applying the statutory scheme existing before
the enactment of Ga. Code Ann. §§ 13-8-50 *et seq.*; however, the basic rules of law remain
essentially unchanged after the new statutory enactment.  In any event, the decision's distinction
between covenants that prohibit solicitation and those that go beyond prohibiting solicitation of
the employer's customers is consistent with the language of Ga. Code Ann. § 13-8-53(b), which
provides for restrictive covenants only that prohibit "soliciting, or attempting to solicit"
customers of the former employer.

employer is unenforceable under Georgia law." <u>Crump Insurance Services v. All Risks, Ltd.</u>, 315 Ga. App. 490, 492, 727 S.E.2d 131, 133 (2012), citing <u>Coleman v. Retina Consultants</u>, 286 Ga. 317, 320(1), 687 S.E.2d 457 (2009).  Moreover, such covenants in restraint of trade are contrary to Georgia's public policy.[8]  <u>Id.</u>

For purposes of the court's § 187(2)(b) choice-of-laws analysis, it is apparent that enforcement of a non-compete agreement with a former employee that prohibits the employee from accepting even unsolicited business from the former employer's customers is contrary to Georgia's fundamental public policy.  The three-step approach set out in § 187(2)(b), which

---

[8]  It should be noted that the concurring opinion in <u>Crump</u> explained that, in a similar case where a Maryland court analyzed a conflict-of-laws issue involving a non-compete agreement with Georgia employees, the Maryland court determined, under RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 187(2)(b), that Georgia law should apply because enforcement of the non-compete agreements would violate Georgia's fundamental public policies.  The concurring opinion stated:

> Maryland follows Section 187 of the Restatement (Second) of Conflict of Laws, *see Jackson v. Pasadena Receivables*, 398 Md. 611, 619–620, 921 A.2d 799 (2007), which provides that a contractual choice of law may be avoided where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which... would be the state of the applicable law in the absence of an effective choice of law by the parties." *Restatement (Second) of Conflict of Laws* § 187(2)(b).  In a similar case involving restrictive covenants and Georgia employees, a Maryland court refused to honor the contractual choice of Maryland law and instead applied Georgia law, inasmuch as "Georgia had a far greater relationship to the employment contracts and... the noncompete agreements violated Georgia's fundamental public policies." *See Hunter Group, Inc. v. Smith*, 9 Fed. Appx. 215, 219(I) (4th Cir. 2001).

<u>Crump Ins. Servs. v. All Risks, Ltd.</u>, 315 Ga. App. 490, 494–95, 727 S.E.2d 131, 135 (2012)

(Blackwell, J., concurring).

Alabama law mandates for such choice-of-law issues, requires the application of Georgia law to the "particular issue" of the enforceability of the non-compete covenant.[9]

Having determined that Alabama law applies to the question of the enforceability of the confidentiality covenant, while Georgia law applies to the enforceability of the non-compete covenant, the question the court must now address in relation to ChemStation's request for a preliminary injunction is whether there is a substantial likelihood of success by ChemStation on either or both of these issues.  The court believes there is a substantial likelihood of success by ChemStation as to the enforcement of the confidentiality covenant and enforcement of the non-compete agreement outside of Georgia.   First, there is little question that Hammonds left ChemStation in possession of a lot of the company's confidential business information, including information about product formulation, product pricing, customer contacts, costs of product, product profit margins, and customer marketing strategies.  Pricing quotes given by Hammonds to ChemStation customers after he left the company are all equal to or less than comparable product pricing by ChemStation—information that Hammonds knew at the time he worked for the plaintiff.  Both Alabama and Georgia law (although Alabama law applies to this issue) recognize  and authorize the use of contractual restrictive covenants to limit a former employee's use of confidential business information gained through his former employment.  ChemStation has a substantial likelihood of succeeding in obtaining permanent injunctive relief prohibiting Hammonds from using its confidential business information.

Turning to the non-compete covenant, there can be no question that, under Georgia law, it is void and unenforceable.  To be enforceable, it must comply with Ga. Code Ann. § 13-8-53,

---

[9]   The court reiterates that it previously has determined that Alabama substantive law applies to the "particular issue" of the enforceability of the confidentiality covenant, as Alabama has a greater material interest in that issue.

which provides that such restrictive covenants can only limit the ability of a former employee to *solicit* customers of the former employer.  The employee is allowed to accept business and sell goods and services to the former employer's customers if the employee does not solicit the business and the customers approach him.  The covenant at issue in the instant case, however, precludes Hammonds' ability to "sell or attempt to sell" goods and services to ChemStation's customers, even if Hammonds does not solicit them.  This violates Ga. Code Ann. § 13-8-53.  The Georgia Court of Appeals has explained:

> [W]here strict scrutiny applies to a non-compete covenant in an employment agreement, Georgia does not use the "blue pencil" doctrine of severability—the rule is that the court will not sever or "blue pencil" an unenforceable non-compete covenant and enforce reasonable restrictions in other non-compete covenants, but will declare all the non-compete covenants unenforceable.

Lapolla Indus., Inc. v. Hess, 325 Ga. App. 256, 262–63, 750 S.E.2d 467, 473–74 (2013), citing Advance Technology Consultants, Inc. v. Roadtrac, LLC, 250 Ga. App. 317, 320–321, 551 S.E.2d 735 (2001); Paramount Tax &Accounting, LLC v. H & R Block Eastern Enterprises, Inc., 299 Ga. App. 596, 602, 683 S.E.2d 141 (2009).  In this case, therefore, insofar as Georgia law is paramount, the non-compete covenant as written is void and unenforceable in Georgia.

The court is persuaded, however, that the question does not end there.  Even though the Comments following the new Alabama Code § 8-1-197 state that the new statutory scheme is intended only to codify pre-existing Alabama case law in this area, the language of § 8-1-197 makes clear that the statute declares "fundamental public policy of the State of Alabama."  Then it mandates, "Therefore, this article shall govern and shall apply instead of any foreign laws that might otherwise be applicable in those instances when the application of foreign laws would violate a fundamental public policy expressed in this article."  Clearly, this language means that,

*in Alabama*, Georgia law cannot apply because it is contrary to the <u>Alabama Code</u> § 8-1-190(b)(4), which authorizes non-compete agreements broader than Georgia allows.  As stated in this provision, Alabama's fundamental public policy allows:

> An agent, servant, or employee of a commercial entity may agree with such entity to refrain from *carrying on or engaging in a similar business* within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place.  Restraints of two years or less are presumed to be reasonable.  [Italics added].

This, of course, is a much broader restriction than Georgia countenances.  Thus, the plain language of <u>Alabama Code</u> § 8-1-197 mandates that, *within the State of Alabama*, Alabama's fundamental public policy must prevail.

The evidence is clear that Hammonds and SPI have "carr[ied] on or engag[ed] in" business with ChemStations customers.  Although most of this business has been with Harrison Poultry, Gourmet Culinary Solutions, and Fieldale in Georgia, there is evidence that Hammonds also has approached some Alabama customers and ChemStation's employees.[10]  Also, the business plan put together by Hammonds in late 2015 clearly lists a number of other ChemStation customers he plans to target at some point.  To the extent they are in Alabama, the non-compete agreement provides relief, on which ChemStation has a likelihood of success.  Thus, there is a substantial likelihood that ChemStation will succeed in getting injunctive relief against Hammonds and SPI prohibiting them from engaging in business with ChemStation customers in Alabama through the period of the non-compete covenant.

---

[10]    Following the hearing on the motion for preliminary injunction, ChemStation offered affidavit evidence that Hammonds had approached one of ChemStations's employees in Mobile, inquiring whether the employee was interested in working for Hammonds and SPI.  The employee declined and the discussions ended.  This evidence implicates Section 3(a)(1) of the 2012 agreement, which limits Hammonds' ability to solicit employees of ChemStation to leave their employment.

### B.  Irreparable Harm to the Plaintiff and Resulting Harm to the Defendants

The next two factors to consider in whether preliminary injunctive relief is appropriate (together with the fourth factor, discussed below) attempt to balance the equities between the parties by measuring who suffers the greater harm from issuing or declining to issue the injunction.  See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1241 (11th Cir. 2005) (Wilson, J., dissenting), citing Garcia–Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).  The second factor—will the plaintiff suffer irreparable harm if a preliminary injunction is not issued?—focuses on the traditional limitation that equitable relief is available only if there is no adequate legal remedy available to the plaintiff.  "A showing of irreparable harm is the *sine qua non* of injunctive relief."  Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation and internal quotation omitted).  "'To demonstrate irreparable harm, a movant must show "that the injury cannot be undone through monetary remedies."  *Anago Franchising, Inc. v. C.H.M.I., Inc.*, No. 09–60713–CIV, 2009 WL 5176548, at *11 (S.D.Fla. Dec. 21, 2009).  The irreparable injury claimed "must be neither remote nor speculative, but actual and imminent."  *Id*. citing (*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).'"  Winmark Corp. v. Brenoby Sports, Inc., 32 F. Supp. 3d 1206, 1223 (S.D. Fla. 2014).  "When an injury is compensable through money damages, the harm is, by definition, not irreparable."  Id.

The third factor—is the harm to the defendant greater than to the plaintiff if the injunction is issued?—deals with the fairness of the hardship caused the defendant by the entry of preliminary relief.  It attempts to weigh whether the defendant is harmed more by the issuance of injunctive relief than the plaintiff is harmed by not entering an injunction.  Generally, a defendant against whom the plaintiff has made a strong showing of a substantial likelihood of

success on the merits cannot complaint that it harm it might suffer is due to its own acts in violation of a contract agreement.

In the instant case, the court is persuaded that ChemStation has shown adequately that it will suffer irreparable harm if the court does not preliminarily enjoin Hammonds from using ChemStation's confidential business information and from engaging in business with ChemStations current customers outside of Georgia.  The evidence is clear that Hammonds, in anticipation of resigning from ChemStation in late 2015, downloaded confidential customer lists, product formulations, pricing, and other secret ChemStation information to which he had access only because of his employment relationship.  The use of this "inside" information by Hammonds causes a severe competitive disadvantage to ChemStation.  Also, Hammonds already has contacted ChemStation customers in Alabama (although he has not done any actual business with them yet), so the threatened loss of Alabama customers is not speculative or hypothetical.  While it may be true that the loss of business revenues or profits caused by Hammonds doing business with ChemStation customers can be repaired by an award of damages, Alabama substantive law makes clear that the loss of customers and goodwill amounts to irreparable harm sufficient to support preliminary injunctive relief.  See Alabama Code § 8-1-191(a)(3).  Also, "The Eleventh Circuit has been willing to accept … that a showing of significant loss of customers and goodwill qualifies as an irreparable injury."  Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC, 605 F. Supp. 2d 1189, 1206 (N.D. Ala. 2009), citing BellSouth Telecomms. v. MCImetro Access Transmission Servs., 425 F.3d 964, 970 (11th Cir. 2005) (quoting Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991)).  Alabama case authority holds that when a former employer makes a *prima facie* showing that a former employee salesperson is actively competing against the former employer in violation a valid non-compete agreement in

which the employer has a protectable interest, "then a rebuttable inference arises that the employer will suffer irreparable injury unless an injunction issues." <u>Ormco Corp. v. Johns</u>, 869 So. 2d 1109, 1119 (Ala. 2003). Protectable interests of the former employer include "valuable customer relationships and goodwill that have been established by the defendant as an employee of the plaintiff and confidential information, such as trade secrets and confidential business practices." <u>Id.</u>

Moreover, the harm to Hammonds and SPI caused by granting a preliminary injunction is less that that suffered by ChemStation in the absence of an injunction. Hammonds and SPI will continue to be able to deal with customers (even ChemStation customers) in Georgia. Thus, the hardship of prohibiting Hammonds and SPI from doing business with Alabama customers is ameliorated. Also, Hammonds has no legitimate right or interest in continuing to use ChemStation's confidential business information, so he cannot complaint that an injunction will prevent him from doing so.

C. *Interest of the Public*

The final factor the court must consider is whether entry of a preliminary injunction in this case is inconsistent with the public interest. As discussed extensively above, the enforceability of non-compete covenants touches on the conflicting fundamental public policies of many states, including Alabama and Georgia. Beyond the interests of the parties in the contractual provisions they have created, the interests of the states themselves in enforcing the law within their authority must be considered. Separate and apart from the choice-of-laws analysis underlying the issue of whether the plaintiff can show a substantial likelihood of success on the merits, the court must also consider whether the enforcement of the relevant restrictive

covenants is consistent with each state's fundamental public policy.[11]   The court has expressed

this before, musing that, in a federal system, Alabama does not have the right to insist that its

_____

[11]   The court has attempted, somewhat ineloquently, to raise with the parties this question of whether a state can insist that its law be enforced in another state, even when that law is inconsistent with the public policy of the latter state.  At times the court has tried to express this concern in terms of basic federalism, that is, that each state has the right to make its own laws within its borders, regardless of whether other states agree with its policy choices.  Granted it occurred in a different context, but the Supreme Court has reminded us that each separate state is sovereign to itself, within the limits imposed by the Constitution and the inherent needs of a federal system.  In discussing whether Alabama's law of punitive damages can be used to punish or deter conduct in *other* states, the Supreme Court said:

> But while we do not doubt that Congress has ample authority to enact such a policy [regarding punitive damages] for the entire Nation, it is clear that no single State could do so, or even impose its own policy choice on neighboring States. *See Bonaparte v. Tax Court*, 104 U.S. 592, 594, 26 L. Ed. 845 (1881) ("No State can legislate except with reference to its own jurisdiction.... Each State is independent of all the others in this particular").
>
> * * *
>
> We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.  Before this Court Dr. Gore argued that the large punitive damages award was necessary to induce BMW to change the nationwide policy that it adopted in 1983.  But by attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy choices of other States.  To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy.  Alabama may insist that BMW adhere to a particular disclosure policy in that State.  Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents.  Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions.

BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 572, 116 S. Ct. 1589, 1597, 134 L. Ed. 2d 809 (1996) [internal footnotes omitted]; see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 421, 123 S. Ct. 1513, 1522, 155 L. Ed. 2d 585 (2003), citing Bigelow v. Virginia, 421 U.S. 809, 824, 95 S. Ct. 2222, 44 L.Ed.2d 600 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its

view of proper economic policy be enforced by injunction with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of the other state.   This consideration comes to the fore when the court must consider whether a preliminary injunction is consistent with the public interest.   In the context of restrictive covenants, states make very different policy choices, and these choices are almost always expressed in terms of the fundamental public policy of each respective state.   As demonstrated in this case, Georgia and Alabama take very different views—as fundamental public policy—when it comes to the enforcement of non-compete agreements.   An injunction that has *interstate* force must respect the policy choices of the states involved, and it must be carefully tailored, to the extent possible, not to offend the public policy of each state.

Once again, distinct from the choice-of laws considerations[12] above, the fourth factor required for a preliminary injunction mandates that an injunction should not be inconsistent with the public interest.   Certainly, the uniform and predictable enforcement of contract provisions is in the public interest in every state.   Nonetheless, the law of Alabama cannot be used to insist

own citizens may be affected when they travel to that State"); New York Life Ins. Co. v. Head, 234 U.S. 149, 161, 34 S. Ct. 879, 58 L. Ed. 1259 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State ... without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound"); Huntington v. Attrill, 146 U.S. 657, 669, 13 S. Ct. 224, 36 L. Ed. 1123 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States").   Thus, an operating principle the court must respect is that each state is entitled to determine its own policies, and no state may insist that its laws be applied within other states to the exclusion of the power of such other states to decide for themselves what is good policy for regulating economic relationships within their own borders.

[12]   Even if the court is in error concluding that Georgia substantive law applies to the non-compete covenant under Alabama's choice-of-law rules, the public-interest prong of the four-part standard for issuing a preliminary injunction requires the court to respect Georgia substantive law in order to assure that the injunction is not inconsistent with the public interest of maintaining comity between the states.

that a contractual non-compete agreement, entered into in Georgia and sought to be enforced in Georgia, override the clearly contrary public policy of the State of Georgia.  In a federal system, Alabama law simply does not extend that far.  The public interest is not served by an injunction that creates conflict between the policies of co-equal states.  In a federal system of co-equal sovereigns, an injunction that requires a state to accept the enforcement of a contract provision plainly at odds with that state's fundamental public policy is not consistent with the public's interest in comity between the states.

As played out in the instant case, Georgia public policy declares the non-compete covenant in this case void and unenforceable, while Alabama would enforce it fully.  Whether preliminary injunctive relief is appropriate, the court finds that, within the borders of these respective states, the requirement that the injunction not be inconsistent with public policy requires denying enforcement of the non-compete covenant in Georgia.  For this reason, as well as the others discussed herein, the court will not grant a preliminary injunction to enforce the restrictions of the non-compete covenant insofar as economic activity and conduct occurs within Georgia.   Conversely, the non-compete covenant is fully enforceable in Alabama, and the confidentiality covenant is fully enforceable in both Alabama and Georgia.

### D.  Injunction Not Contingent on Posting of Bond

Having determined that ChemStation in entitled to a preliminary injunction with respect to some aspects of the 2012 contract, the next question concerns whether and/or what bond should be required of ChemStation as a pre-condition to the issuance of the preliminary injunction.  Plaintiff has filed a motion asking the court to relieve it of the obligation to post bond.  (Doc. 20).  Rule 65(c) of the Federal Rules of Civil Procedure states:

> **Security**. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Just a few years ago, a judge of this court opined that the requirement of bond for a preliminary injunction that limits or interferes with money-making activity cannot be waived or reduced to a nominal amount.  Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers, 297 F.R.D. 633, 635 (N.D. Ala. 2014).  The Eleventh Circuit, however, has said at least twice (although once in an unpublished opinion) that whether to set a bond as a condition to the issuance of a preliminary injunction and in what amount are within the discretion of the trial court.  For example, in an unpublished decision, the court of appeals wrote:

> Appellant does not contest these findings by the district court but argues that pursuant to Fed. R. Civ. P. 65(c) a bond is mandatory.  Such is simply not the case. Under our existing precedent, it is within the discretion of the court to set the amount of the bond or to require "no security at all."

AFC Enterprises, Inc. v. THG Restaurant Group, LLC, 416 F. App'x 898 (11th Cir. 2011), quoting and citing BellSouth Telecomms., Inc. v. MCImetro Access Transmission Services, LLC, 425 F.3d 964, 971 (11th Cir. 2005).  Even so, there does not appear to be any well-developed case law examining the circumstances under which a bond under Rule 65(c) can be waived by the court.  Here, however, despite the filing of the motion for relief from bond, the defendants have not filed any opposition to the motion or otherwise commented about security. As Chief Judge Steele in the Southern District of Alabama has said, "The defendants, despite full opportunity to do, did not request imposition of a security requirement, and the Court will not intercede on their behalf. Accordingly, no security will be required."  Williamson v. City of

Foley, Alabama, 146 F. Supp. 3d 1247, 1253 n. 4 (S.D. Ala. 2015).  The motion for relief from bond will be granted.


## Conclusion

The court concludes that the plaintiff's motion for a preliminary injunction is due to be GRANTED; however, the court must carefully tailor the injunction to limit its operation to activities within the proper public policies of the States of Alabama and Georgia.  In that regard, the court will enjoin the defendants, Terry Hammonds and SPI Chemicals LLC, from engaging in any business with a current customer of the plaintiff at facilities within the State of Alabama until the entry of final judgment in this cause or January 11, 2018, whichever first occurs. Further, the court will enjoin the defendants from retaining or using in any way, at any time, and anywhere, any confidential business information belonging to the plaintiff and obtained by the defendants by virtue of Hammonds' former employment with plaintiff.   Such confidential business information shall include, without limitation, customer lists and contact information, prospect lists and contact information, pricing information, production data, product formulations, cost and overhead data, marketing strategies, and any other record or electronic information obtained by Hammonds from the plaintiff's computer systems, books, memoranda, or manuals.   Within fifteen (15) days after the issuance of the preliminary injunction, the defendants shall return all such confidential business information to the plaintiff, or if it is not capable of being returned, to delete, purge, or destroy such confidential information, and certify to the court that such has occurred.  Likewise, the defendants will be enjoined from attempting to recruit or employ any current employee of the plaintiff employed at a facility outside the State of Georgia.

The motion for preliminary injunction will be DENIED to the extent that it seeks to restrain the defendants from competing with the plaintiff at facilities located in the State of Georgia.

ENTERED this 13th day of March, 2017.


T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE